CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

June 30, 2025

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **JARED MEADOWS,** | ) | **Case No. 7:23-cv-740** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Hon. Robert S. Ballou** |
| | ) | **United States District Judge** |
| **WARDEN I. HAMILTON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

Jared Meadows, a Virginia inmate proceeding by counsel[1], filed a civil rights action pursuant to 42 U.S.C. § 1983, alleging that defendants violated his constitutional rights by imposing excessive visual strip searches at Keen Mountain Correctional Center, where he is incarcerated. Dkt. 31, Sec. Am Compl. Defendants Sgt. D. Squier, a correctional officer at the facility, and Warden I. Hamilton, the Warden of the facility, moved for summary judgment, to which Meadows has responded. Dkt. 34, 36. Because I find that Meadows did not exhaust his administrative remedies, as required, prior to filing suit, I will grant the defendants' motion for summary judgment. Alternatively, Meadows has not shown that defendants violated his constitutional rights, and thus the defendants' motion for summary judgment will be granted on those grounds as well.[2]

---

[1] Though Meadows was initially *pro se* when he filed his complaint on November 15, 2023, counsel filed a Notice of Appearance in February 2024. Dkt. 6.

[2] The plaintiff here, along with two other inmate plaintiffs, moved to consolidate their cases for purposes of discovery, which the court granted on August 26, 2024. The plaintiffs were all housed at Keen Mountain, subjected to the same strip search procedure, are represented by the same counsel, and have filed similar pleadings. *See* Case Nos. 7:23cv584, 7:23cv740, and 7:23cv801.

I.    **Factual Background**[3]

In 2023, for a period lasting approximately 30-60 days, Keen Mountain increased

the frequency of strip searches for inmates participating in no contact video visits, requiring strip

searches both before and after video visits.[4] Pursuant to this policy, Meadows was strip searched

over 200 times from June 1, 2023 through July 31, 2023 related to no contact video visits. Sec.

Am. Compl. ¶ 19. These strip searches occurred in a relatively private area, were conducted by

members of the same sex, and were visual only, involving no touching.[5] Dkt. 35 ¶¶ 15-17; Dkt.

36 ¶¶ 15-17.

Warden Hamilton imposed the strip search policy based on prison officials' belief that

inmates were using the video visitation room to pass drugs and other contraband. Aff. Squier,

Dkt. 35-2, ¶ 4, Depos. Hamilton, Dkt. 39-4 at 11, Dkt. 35-7. Keen Mountain inmates of security

level 4 and security level 1-2 use the video visitation room, one of the only places at the prison

used by both security levels. Dkt. 35 ¶ 7. While Meadows disputes that evidence exists that

inmates used the video visit area to exchange contraband, he acknowledges Warden Hamilton's

statements at deposition that the "intel" from confidential informants indicated the inmates were

leaving the drugs in the video visitation room, to exchange it through the entire prison

population. Dkt. 39 ¶ 8, Dkt. 36 ¶ 8; Dkt. 35-4, at 11.

In the months preceding the strip search policy, correctional officers found contraband on

inmates on multiple occasions, including drugs rolled up in toilet paper, in the waistband of a

---

[3] The following facts are undisputed or construed in the light most favorable to Meadows, the nonmoving party, unless otherwise noted.

[4] Warden Hamilton made the decision to conduct these additional strip searches, which the VDOC Western Regional Operations Chief approved. Dkt. 35-4, at 42.

[5] Sgt. Squier, who performed most of the strip searches at issue on Meadows, generally indicated that he instructed Meadows to spread his fingers, open his mouth and stick out his tongue, run his fingers through his hair, lift his arms, lift his penis, lift his testicles, and squat and cough. Dkt. 36 ¶ 38.

prisoner's pants, and in a black glove inside an inmate's rectum, as well as in inmate's cells. Aff. Squier, Dkt. 35-2, ¶ 4. During this same timeframe, multiple separate inmate overdoses occurred, requiring administration of Naloxone (Narcan) by prison staff. *Id.* As Meadows points out, these were "incidents around the facility," not involving inmates using video visitation or the video visitation room. Dkt. 36 ¶ 4.

Meadows brings Counts I and II, alleging violations under the Fourth and Eighth Amendments by both defendants, and Count III for supervisory liability against Warden Hamilton. Meadows maintains that the number of strip searches was excessive, and thus not reasonable under the circumstances. Indeed, Meadows acknowledges that some searches would have been reasonable under defendants' explanation that inmates were using the video visit room to exchange contraband but argues that the "sheer number and frequency" of the searches Meadows endured was not reasonable. Dkt. 36 at 9. In support, Meadows points to the fact that searches occurred both before and after all no contact video visits, even though it is undisputed that inmates could not have physical contact with anyone while in the video visitation room. Dkt. 36 ¶ 33. Meadows also emphasizes that no contraband was found on Meadows during the strip searches, nor on any of the other inmates using video visitation. *Id.* ¶¶ 39, 40.

### A. Administrative Exhaustion

Defendants raise the affirmative defense that Meadows failed to exhaust administrative remedies prior to filing this action. Under the Prison Litigation Reform Act ("PLRA") "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The applicable rules for administrative exhaustion are "defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007). In

the Virginia Department of Corrections inmates must follow each step of the administrative process to resolve grievances. Operating Procedure 866.1, Dkt. 35-1, at 4. First, the inmate submits an informal written complaint, to which prison staff have fifteen days to respond. *Id.* If the inmate is unsatisfied with the response, or prison staff fails to respond within 15 days, then the inmate may file a regular grievance. *Id.* The regular grievance must be submitted within 30 days of the incident. *Id.* Filing an informal written complaint is required, with certain exceptions, prior to filing a regular grievance, and failure to file an informal written complaint "may result in a rejected regular grievance upon intake." [6] *Id.* Following receipt of the regular grievance, staff has two working days to accept or reject the grievance, and if the grievance is rejected, two working days to return the grievance to the inmate for possible resubmission or appeal. *Id.* at 4-5. If the inmate disagrees with the intake decision, the inmate must appeal the decision within five days. *Id.* at 8.

Defendants provided the Affidavit of H. Hardin,[7] the Grievance Coordinator at Keen Mountain, who reviewed Meadows' grievance files. Meadows filed an informal written complaint dated August 22, 2023, regarding the strip searches performed on him between June 24, 2023 and July 20, 2023, which is stamped "Received August 28, 2023."[8] Dkt. 35-1, ¶ 16;

---

[6] An informal written complaint is not required when an inmate alleges sexual abuse or sexual harassment, or under certain other circumstances where other documentation satisfies the process. Dkt. 35-1 at 4.

[7] The Grievance Coordinator at Keen Mountain, originally H. Harr in her Declaration, subsequently changed her name to H. Hardin. *See* Depos. H. Hardin, Dkt. 35-3 at 4.

[8] The written complaint states:

> Between the dates of June 24, 2023 and July 20, 2023, Sgt. Squier, on the orders of Warden Hamilton, have repeatedly harassed and personally offended me with countless strip searches, which involved rectal and testicle examinations, were unreasonable considering that I was locked inside of a booth with no human contact the second strip search during each visit was unreasonable and violated my Fourth Amendment right.

Dkt. 35-1, at 28.

Dkt. 35-1 at 28. Lt. Harrison responded to the informal written complaint on September 8, 2023, which Mr. Meadows received on September 11, 2023. Dkt. 35-3 at 52. Meadows then filed a regular grievance about the issue, which was stamped "Received September 11, 2023."[9] Dkt. 35-1, at 29-30. The Grievance Coordinator rejected this regular grievance as untimely because it was filed more than 30 days after the events occurred. Dkt. 35-1, ¶ 17. Meadows did not appeal the decision rejecting the grievance as untimely. *Id.*

Meadows claims he initially filed an informal written complaint regarding the strip searches during the first week of August 2023, but he did not receive a receipt or copy of the written complaint. Meadows Decl., Dkt. 36-1. When Meadows questioned the Grievance Coordinator, she told him it "must have gotten lost." Thus, Meadows submitted *another* informal written complaint dated August 22, 2023, and then filed a regular grievance after receiving a response to that informal complaint. *Id.* Meadows does not specify either the date he filed the first (lost) informal written complaint, or the date he asked the Grievance Coordinator about its status. Meadows claims that "due to [his] first complaint being lost . . . it became impossible for [him] to comply with the grievance procedure." *Id.* ¶ 9.

The Grievance Coordinator does not recall the conversation with Meadows, where he claims she told him the informal written complaint he filed in early August 2023 "must have gotten lost." Depos. H. Hardin, Dkt. 35-3 at 12. However, she explained that generally, once the inmate submits the informal written complaint form to her, she will "process it into CORIS" and provide the inmate with a receipt. *Id.* at 7. The receipt for the informal written complaint is returned to the inmate within two or three days of filing, and if the inmate does not get the

---

[9] Meadows points out that the regular grievance does not have a date or time stamp showing when it was filed, though there is a stamp indicating it was received on September 11, 2023.

receipt within that timeframe, it should signal to him that he needs to ask about, and potentially submit, another informal written complaint. [10] *Id.* at 64. Under these circumstances, if the informal written complaint is lost, then the inmate would not need to wait the full 15 days for a response to the informal written complaint.[11] *Id.*

Defendants ask for summary judgment, arguing that Meadows failed to exhaust his administrative remedies as required. Defendants also argue that the searches were reasonable under the Fourth Amendment and that Meadows cannot establish the required elements for an Eighth Amendment claim.

## II.    Summary Judgment Standard

The court should grant summary judgment only when the pleadings and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. On summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *Id.* at 255. However, when a motion for summary judgment is properly supported by affidavits, the nonmoving party may not rest on the mere allegations or denials in his pleadings.

---

[10] OP 866.1 indicates that staff must accept all written complaints for consideration unless the inmate is limited, and within two working days of receipt, must log the written complaint in VACORIS, and provide the inmate with the receipt as a notification of acceptance. Dkt. 35-1 at 6.

[11] Meadows writes that the Grievance Coordinator testified during her deposition, that if an informal written complaint is lost, inmates must wait at least 15 days before submitting a second informal written complaint on the same issue. Dkt. 36 at 15. However, the Grievance Coordinator clarified that if an inmate does not get a receipt within two or three days of submitting an informal written complaint, then he may inquire about whether it was lost, and can submit another written complaint without waiting 15 days. Dkt. 35-3 at 64.

*Anderson*, 477 U.S. at 256. Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find in his favor. *Id.* at 256-57.

### III.    Law and Analysis

### A.  Exhaustion

The PLRA requires inmates to exhaust available administrative remedies prior to bringing lawsuits. 42 U.S.C. § 1997e(a). This demands "proper exhaustion" meaning "untimely or otherwise procedurally defective administrative grievance[s] or appeal[s,]" as determined by the correctional institution's procedural rules, do not satisfy the PLRA's exhaustion requirement. *Woodford v. Ngo*, 548 U.S. 81, 83 (2006). However, prison officials may not take unfair advantage of the exhaustion requirement, and a remedy becomes "unavailable" if "a prisoner, through no fault of his own, was prevented from availing himself of it." *See Moore v. Bennett,* 517 F.3d 717, 725 (4th Cir. 2008). The Supreme Court in *Ross* recognized three instances where an administrative remedy is considered "unavailable"; (1) "it operates as a simple dead end— with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) the "administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use;" (3) "when prison administrators' thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 644 (2016). The Fourth Circuit has held that "a grievance process is rendered 'unavailable' under the PLRA only if an inmate actually is prevented from using it." *Moss v. Harwood*, 19 F.4th 614, 623 (4th Cir. 2021).

Meadows argues that the administrative remedy became unavailable to him due to jail personnel losing his first informal written complaint, arguing that "given that he had no way of proving the filing of his earlier 'lost' written complaint, there was no way for [him] to present

any evidence for an appeal of the technical rejection."[12] Dkt. 36 at 10. However, Meadows'

argument–essentially that appealing the rejection of his regular grievance as untimely would

have been futile–is unconvincing.

The Supreme Court has identified the benefits of requiring exhaustion as including

"allowing a prison to address complaints about the program it administers before being subjected

to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving

litigation that does occur by leading to the preparation of a useful record." *Jones v. Bock*, 549

U.S. 199, 219 (2007). Meadows' claim that jail personnel lost the informal complaint he filed in

early August does not provide a pass to evade the requirements of exhaustion, because despite

this admitted setback, steps of the grievance procedure remained available to him. He just did not

pursue them. "Proper exhaustion demands compliance with an agency's deadlines and other

critical procedural rules because no adjudicative system can function effectively without

imposing some orderly structure on the course of its proceedings." *Woodford*, 548 U.S. at 90–91

(2006). Here, Meadows did not appeal the intake decision rejecting his regular grievance as

untimely. "The requirement that inmates comply with all steps of a grievance policy is important

because it gives a prison a full 'opportunity to correct its own mistakes' before federal litigation

is launched." *Moss*, 19 F.4th at 621 quoting *Woodford*, 548 U.S. at 89 (internal quotation marks

---

[12] Meadows also argues that he could not possibly have submitted the more than 200 informal written complaints that would have related to each search, and thus could not have navigated the complex process of exhausting his administrative remedies. However, this argument is pure speculation, as there is no evidence that Meadows attempted and failed to submit an informal written complaint for each search, nor was his informal written complaint rejected for "covering more than one issue." Also, as the defendants point out, of the "three related cases that were consolidated for discovery, only [Meadows] neglected to exhaust his administrative remedies." Dkt. 37.

Finally, Meadows claims that his informal written complaint could have been construed as grieving a PREA issue, which means it would not have been subject to the same timeliness requirements. However, as explained during the Grievance Coordinator's deposition, the complaint was found not to allege sexual abuse or sexual assault, and thus not to be a PREA issue. Further, Meadows did not appeal the rejection of his grievance as untimely, and finally, OP 866.1 provides that inmates are not even required to use the informal written compliant process to allege an incident of sexual abuse or sexual harassment. Dkt. 35-1 at 6.

omitted). According to OP 866.1, if an inmate wishes to appeal the intake decision on his grievance, he must appeal to the Regional Ombudsman within five days of receipt of the returned grievance, and the Regional Ombudsman "must make a determination to either uphold or overturn the intake decision" and there is no further review of appeal following the Regional Ombudsman disposition. Dkt. 35-1 at 13. Meadows' regular grievance indicated it was being returned due to an expired filing period and contained the following language:

> You must submit your grievance within 30 days of the original incident or discovery of the incident unless the reason for delay was beyond your control, you have not been provided formal orientation, or a more restrictive time limit has been established to prevent loss of remedy or the issue becoming moot.

Dkt. 35-1, at 30. The regular grievance also contained language advising Meadows of his ability to appeal, indicating "If you disagree with the intake decision, you have 5 days from date of receipt to send an appeal of the intake decision to the Regional Ombudsman by submitting this grievance for further review." *Id.* Meadows declined his chance to explain his delay in filing and argue that his grievance should have been accepted and logged into VACORIS, when he did not appeal the intake decision.

Of course, appealing the rejection as untimely would not necessarily have allowed Meadows to properly exhaust his claim. *See Jackson v. Barksdale*, No. 7:17cv31, 2017 WL 3446259, at *3 (W.D. Va. Aug. 10, 2017) (recognizing a regular grievance's rejection at intake, even if appealed, does not constitute exhaustion, and to qualify as such, it must be resubmitted, accepted, and appealed to the highest level), *aff'd*, 707 Fed. App'x 786 (4th Cir. 2018). However, the court cannot speculate on the outcome of that process, which does not matter to this analysis anyway. At bottom, Meadows failed to follow all the steps of the administrative process and "proper exhaustion of administrative remedies . . . means using all steps that the agency holds out . . . ." *Woodford*, 548 U.S. at 90 (internal citations and quotations omitted).

9

Likewise, beyond the fact that Meadows failed to appeal the rejection of his regular grievance as untimely, Meadows had the responsibility to submit an informal written complaint early enough to ensure that it would be resolved in time to submit a Grievance. Jail personnel losing Meadows first informal written complaint does not render the grievance process unavailable to him, as he had various options which he did not take, at least in a timely manner. When Meadows failed to receive a receipt upon the filing of his first informal written complaint, he could have made a verbal or written request about its status within a few days, and then, upon learning it was lost, filed again. Indeed, the grievance coordinator explains during her deposition that inmates are provided with this receipt primarily for the purpose of tracking the informal written complaint. Dkt. 35-3 at 17. Instead, despite receiving no receipt after filing an informal complaint in the "first week of August," Meadows waited until August 22 to file a second informal complaint. Meadows Decl., Dkt. 36-1. *See e.g. Harris v. Elam*, No. 7:17CV00147, 2020 WL 2079976, at *2 (W.D. Va. Apr. 30, 2020), *aff'd sub nom. Harris v. Jackson*, 846 F. App'x 188 (4th Cir. 2021) (finding that while an inmate's failure to investigate the lack of a receipt or response to his informal written complaint does not constitute noncompliance with exhaustion requirements, it does "undermine the credibility of his contention that the required grievance procedure was unavailable to him through no fault of his own").

Accordingly, I find that Meadows did not exhaust his administrative remedies, as required, prior to filing suit, and I will grant the defendants' motion for summary judgment on those grounds. In the alternative, I find that Meadows has not shown that defendants violated his constitutional rights, and thus the defendants' motion for summary judgment will be granted on those grounds as well, as explained below.

10

### B.  Fourth Amendment Claim

"A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Hudson v. Palmer*, 468 U.S. 517, 527–28 (1984) (finding "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell"). However, while prisoners must surrender many rights of privacy, compared to those people claim in their private homes, the Fourth Circuit does recognize limited Fourth Amendment rights of bodily privacy. *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981) (discussing a strip search of a female inmate done in the presence of male guards, noting that most people have a "special sense of privacy in their genitals [such that] involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating").

 In the prison context, a search is reasonable under the Fourth Amendment if the need for the search outweighs the invasion of personal rights that the search entails. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (describing a detention facility as a "unique place fraught with serious security dangers" and upholding prison policy providing for a visual body cavity strip search of prison inmates). To determine the reasonableness of a sexually invasive search, the Supreme Court in *Bell* held that four factors must be considered in each case: (1) the scope of the particular intrusion; (2) the manner in which it is conducted; (3) the justification for initiating it; and (4) the place in which it is conducted. *Id.* Weighing these factors, I find the searches here reasonable under the Fourth Amendment.

Regarding the first two factors, both sides agree that the strip searches at issue were visual strip searches only, with no touching, conducted by male guards (i.e. guards the same sex

11

as Meadows). Regarding the third factor, defendants justify the searches as a response to a growing drug problem in the prison, with multiple recent overdoses, applying intel that inmates were using the video visitation room to exchange contraband. Defendants provided incident reports showing over 15 inmate drug overdoses from February to June 2023, with 13 overdoses occurring in late May and June. Dkt. 35-6. While Meadows admits that this justification is "plausibly reasonable," he claims it does not explain the "sheer number and frequency of searches" including searching inmates both before and after the video visitation. Dkt. 36 at 18. However, I find that defendants' justification for initiating the visual strip searches, specifically as a response to increased drug overdoses, many of which required administering Narcan and other emergency medical care to unresponsive inmates, weigh in favor of reasonableness. Controlling contraband is a legitimate purpose, and necessary for the health and security of the inmates. *King v. Rubenstein*, 825 F.3d 206, 216 (4th Cir. 2016). Increased strip searches were a reasonable response to the recent spike in drug overdoses, which threatened the security of inmates and prison staff. Prison administrators are "obligat[ed] to take reasonable measures to guarantee the safety of the inmates" and "must be ever alert to attempts to introduce drugs and other contraband into the premises which . . . is one of the most perplexing problems of prisons today. . . ." *Hudson*, 468 U.S. at 526–27.

Meadows argues that it was excessive to search inmates, including Meadows, both before and after the video visit when the inmate has no contact with anyone in the video visit room, and thus, ostensibly, could not acquire contraband there. Defendant Sgt. Squier justified the searches by highlighting the various "creative" ways used by inmates to pass contraband. Depos. Squier, Dkt. 35-5 at 62. He described seeing inmates "take and get stuff under doors a lot easier than you think you could" as well as hiding items inside their bodies, which may not be found during a

visual strip search. *Id.* at 62-66. Defendant Warden Hamilton also explained that he had acted on information that inmates were leaving the contraband in the video visitation room to spread it around the jail, thus justifying a search both before and after going into the room. Noting how small the drugs can be, Warden Hamilton explained that "inmates can hide things in different places, on their body, in their body, wherever" and thus, one inmate could leave it in the room, and then another would retrieve it and take it back to his building. Dkt. 35-4, at 23. He also described in detail how inmates can hide things – that it may be in their rectum, or underneath their arm or belly, or in their shoe – and that he took these measures to try to keep inmates safe and to keep them from overdosing. In Warden Hamilton's view, the strip search measures made sense, because "yes, [the inmates] absolutely sometimes can beat a strip-search, but sometimes they can't." *Id.* at 25; *See Johnson v. Robinette*, 105 F.4th 99, 115 (4th Cir. 2024).

The Warden's rationale is clear, one inmate may transport the drugs into the video room and leave them without being detected, but another inmate might transport those drugs out of the room and be caught.[13] *Id.* Importantly, though Meadows clearly disagrees with this rationale and resents its effect on him, he provides nothing showing it to be irrational, unnecessary, or contrary to the goal of prison security. That the video visitation room contained only a stool and a small screen, both bolted down, a locked door, and observation glass, does not change this analysis. Clearly, these are safeguards to promote security, but not foolproof in preventing inmates from hiding contraband. Courts have repeatedly deferred to prison administrators in the "adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547; *Florence v. Bd. of*

---

[13] Warden Hamilton also indicated that inmates are strip searched before and after contact visitation, before or after leaving the prison, kitchen workers are strip searched going into and coming out of the kitchen, and those in restorative housing are strip searched every time they leave their cells. Dkt. 39-3, at 37-39, 46.

*Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 322-23 (2012) ("In addressing this type of constitutional claim courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security.").

Further, the fact that correctional officers found no drugs on Meadows during these searches does not necessarily make them unjustified. The United States Supreme Court, in *Bell*, rejected the argument that failing to find contraband made a search unreasonable, instead noting that the searches themselves may be having a deterrent effect. 441 U.S. at 559 ("That there has been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises."). Finally, Meadows, while acknowledging that some searches were justified, argues that there must be a need for "**a particular search,** not searches in general." Dkt. 36 at 18 (emphasis in original). However, as this is Meadows' lawsuit, he would bear the burden of alleging a "particular search" was unjustified, which he has not even attempted to do. Further, "the Supreme Court has not required individualized suspicion for strip searches involving inmates." *Amisi v. Brooks*, 93 F.4th 659, 667 (4th Cir. 2024) (*citing Bell*, 441 at 560 (1979)).

Regarding the final factor, these searches were conducted in a relatively private room, with only the correctional officers involved in the search present, and no member of the opposite sex present. Accordingly, I find that these searches were reasonable under the factors outlined in *Bell* and did not violate Meadows' limited Fourth Amendment rights to bodily privacy in the prison context.

14

### C. Eighth Amendment

The Eighth Amendment guarantees inmates the right to be free from "cruel and unusual punishments." U.S. Const. amend. VIII. To support his claim under the Eighth Amendment, Meadows alleges that the searches "served no penological purpose, but were instead sexually invasive forms of intimidation and harassment." Dkt. 36 at 23. Inarguably, sexual assault of a prisoner by a correctional officer serves no penological purpose. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ("Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society."). However, while accurate that sexual assaults of prisoners violate the Eighth Amendment, Meadows has provided no evidence of sexual assault in this case. This case involves visual strip searches only, with no touching, improper or otherwise, and I have already found that these searches served a reasonable purpose in the prison – to address the increased contraband that threatened the safety of both inmates and prison staff. The case law cited by Meadows is inapposite to the circumstances of this case. Visual strip searches are not sexual abuse – but instead have been upheld for precisely the penological purpose used here – to stem the flow of contraband in prison. *Johnson v. Robinette*, 105 F.4th 99, 117 (4th Cir. 2024) (visual strip searches performed in the course of official duties do not fall within PREA's definition of sexual abuse); *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 322 (2012) ("Weapons, drugs, and alcohol all disrupt the safe operation of a jail."); *see also West v. Murphy*, 771 F.3d 209, 212 (4th Cir. 2014) ("[C]ontraband poses significant security risks and dangers inside detention facilities. Weapons or other items may be used to attack officers or other arrestees. Arrestees may overdose on drugs, or their intoxication may create additional burdens for officers."). In *Johnson*, the Fourth Circuit wrote it had "no doubt that strip searches are a necessary tool for corrections officers who are responsible

15

for seeking out such hidden contraband." 105 F.4th at 114. The Fourth Circuit rejected the inmates claim that a "reasonable jury" could find the correctional officer's strip searches were "sexually harassing and abusive" because the officer did not have a legitimate basis for the search – the same argument Meadows makes here. Meadows alleges no facts to support any claim for sexual assault, abuse, or rape, and does not allege any touching during the visual strip searches. Accordingly, Meadows does not have a claim under the Eighth Amendment.

Because I find that the underlying conduct did not violate Meadows' constitutional rights, his claims for supervisory liability also are without merit. *See Temkin v. Frederick Cnty. Comm'rs,* 945 F.2d 716, 724 (4th Cir. 1991); *Doe v. Rosa*, 664 F. App'x 301, 304 (4th Cir. 2016) ("There can be no supervisory liability when there is no underlying violation of the Constitution.").

## IV.    Conclusion

Accordingly, the defendants' motion for summary judgment will be granted.[14] An appropriate order accompanies this opinion.

Entered:  June 30, 2025

*Robert S. Ballou*

Robert S. Ballou
United States District Judge

---

[14] Defendants also argue that they are entitled to qualified immunity, however, as I find that Meadows has no constitutional claims, I need not address defendants' arguments concerning qualified immunity.